## PHILPOT *v.* GRUNINGER.

1. In the matter of a contract, a distinction sometimes exists between a *motive* which may induce entering into it and the actual consideration of the contract. *Ex. gr.*, A person, in virtue of some benefit passing to him, may be bound to give for it his promissory-note for a certain sum and payable at a certain time, and yet refuse to give the note. Now, if upon an expectation of some particular results in another transaction, into which expectation he is led by his creditor in the original transaction, he gives the note, the original benefit to him, and not the expectation, must be regarded as the consideration of the note.

2. A promise by one party being a good consideration for a promise by another, a jury will not, in a case where such mutual promises are shown, and no dependence exists between them, be held to have been misinstructed by a direction which makes a distinction between motive and consideration, such as taken in the paragraph above, even if the distinction be one not well founded  The instruction could do no harm.

3. A consideration moving to A. and B., with whom C. afterwards enters into partnership, and of which consideration C. thus gets the benefit, will support a promise by C.

4. On an issue between a partnership and third parties as to the day when the partnership was formed, the mere articles of partnership are not evidence in favor of the partnership  It must be shown by extrinsic evidence, that they were made on the day when they purport to have been made.

ERROR to the Circuit Court for the Northern District of Illinois; the case being this:

On the 19th of October, 1864, Gruninger, by articles of agreement, sold, or agreed to sell, to B. Philpot and H. Picket, residing at Titusville, Pennsylvania (who, with George Sherman, of Philadelphia, had been speculating in oil wells), a well "*on the Blood Farm*," near the town named; Philpot and Picket agreeing by the articles to pay Gruninger $3500 within thirty days. The money was not thus paid. Gruninger, after the sale, went to Massachusetts, but by the 24th of February, 1865, had returned to Titusville. On the day just mentioned Picket writes to him expressing satisfaction at his return, and acknowledging the receipt of a letter from him "some time since; an answer to which had been neglected on account of press of business until it had passed out of mind," and saying:

" I think we can fix up *that Blood Farm* matter satisfactorily, when you come up."

By the 21st of April, 1865, Philpot, Picket, and the Sherman already named had become interested as partners, under the name of Philpot, Sherman & Co., in the well on Blood Farm (if indeed Sherman had not been partner with the other two from the first) and in other oil wells; and on that day the partnership, under the firm name, along with several other projectors in oil (not, however, including Gruninger) entered into an agreement to form a joint stock company; Philpot, Sherman & Co. agreeing to put into the company certain wells, but not this one, which they had bought or agreed to buy, on the Blood Farm.

On the 6th of May, 1865, Gruninger also agreed to put in a certain well which *he* still owned; one on the Smith Farm; and on the same day, by deed, witnessed and acknowledged, " in consideration of the sum of $3000," which was acknowledged to have been to him " paid, and the receipt of which he acknowledged," conveyed to *Philpot, Sherman & Co.*, the already mentioned well on the Blood Farm. On that same day, but without reciting on account of what transaction, Philpot gave the firm note for $3000, payable to Gruninger on demand.

The joint stock company apparently fell through. Gruninger, at any rate, would not put in his well on Smith's Farm.

On the 5th July, *Picket*, one of the persons to whom Gruninger had agreed to sell the well on the Blood Farm, and a member of the now admitted firm of Philpot, Sherman & Co., writes to Gruninger, from Titusville, signing the firm name:

" We have learned that the note given you by our firm has been sent to Philadelphia for collection. All *I* can say is, we are, at present, unable to pay it. The change in times has so contracted our means as to make it doubtful if we are able to pay your note in cash at all. We will be glad to settle with you by letting you have some good property any time; but

money, at the present time, is out of the question with us. Let us hear from you soon."

And on the same day Philpot, in Philadelphia, writes to him from there:

"The note given by me to you has been presented by a collector for payment. We think this a strange proceeding under the circumstances the note was obtained, and a part having been paid. We have your name to a contract assigning us your interest in well on the Smith Farm, and we would recommend that you withdraw that note, and, as soon as convenient, meet us in Philadelphia, when a satisfactory adjustment of the whole can be arrived at. If you push that note, we shall assuredly demand that interest which we have you bound for, and proceed accordingly."

Gruninger replies, two days afterwards, by a single letter addressed to the firm:

"Yours of July 5th was received with one also of same date. You write me that the note given by you to me was presented to you by a collector for payment, and you think it a very strange proceeding. I myself can't see anything strange in it. You know that the note ought to have been paid this long time. I am in need of money, and must have it.

"I am sorry to see you mention in your letter about a contract I assigned to you, and you would 'recommend me to withdraw that note as soon as convenient,' &c.; and that if I push that note you shall demand the interest, which, you say, you have me bound for, and proceed accordingly. If you think *this* kind of talk goes with me, you better try it. I am sorry that you have wrote so. And the note I have given to collect must and shall be collected, if—. I am sorry to answer you in *this* way, but you commenced it."

No arrangement being made, Gruninger sued all three persons as partners on the note. Philpot and Picket pleaded jointly and Sherman separately and alone. The defence was, in substance, that the note was given by them to Gruninger in consideration of the *agreement* of Gruninger that he would become a member of the proposed oil company,

and put certain property in it, and also in consideration of the transfer to them of the well on the Blood Farm; and that he had failed and refused to perform his agreement, and that the well had no value.

Gruninger, on the other hand, asserted that it was given in consideration alone of the transactions of October 19th, 1864, and of an existing debt.

The controversy thus involved was, of course, what the consideration of the note really was.

On the trial the defendants offered in evidence articles of partnership dated 8th November, 1864, and between them, in order to show that the partnership between the three was not in existence when the articles of agreement of October 19th, 1864, were made; but they did not offer or propose to offer any other evidence of the same fact.

The court rejected the articles.

The plaintiff and defendants each gave evidence tending to show on the one side that the well on the Blood Farm was worth what it cost, on the other that it was worthless.

In charging, after adverting to the various letters already quoted, including that of July 5th, by Picket, in the firm's name, in which no objection is taken to the validity of the note, and the cause of its non-payment is stated to be that the firm was *then* unable to pay it *in money*, and after adverting to some other evidence the court said:

"If, in point of fact, the note was given in consideration of past transactions, of obligations already accrued or accruing, then, of course, the defence fails.

"If, on the other hand, the note was given in consideration of the agreement, on the day, 6th of May, made by Gruninger, to enter into the company; and also, in consideration of the transfer of the said well, and he did not enter into the company, but failed to comply with his agreement, and there was no value in the well, as stated in the plea, then the defence is made out."

The court, however, said further:

"But it is proper for you to consider whether or not *this* might have been the state of the case: that there were trans-

actions between the parties; that there was a claim on one side, and which may have arisen, or did arise, in consequence of these transactions. Now, was there a present, existing indebtedness from Philpot and Picket, or from Philpot, Sherman & Co., to Gruninger, and was the execution of this agreement by Gruninger, on the 6th of May, *simply a motive* for the giving of the note and not *the consideration* of the note? It *may* be that that was held out as an inducement to the defendants to give the note, as a motive for putting the debt in the shape of a note rather than let it remain in its then present form. If that were so, then the defence would fail, because that proceeds upon the ground, as I understand, that the actual consideration of the giving of the note, not the motive for putting the claim in that form, was the signing of this agreement of the 6th of May, and the transfer of the well on the Blood Farm.

"It may well happen that A. may owe a valid debt to B., and B. may say to A., 'If you will put the debt in the shape of a note I will do some act for you;' and then, when it is done, the promise to put the debt in that shape is not the consideration of the note, but the debt which is due from one to the other."

The jury found for the plaintiff, and judgment was given accordingly. On exceptions to the portion of the charge last above quoted, and to the rejection of the partnership articles, and on some other matters not necessary in any part to be reported, the case was now here.

*Messrs. S. B. Gookins and J. H. Roberts, for the plaintiffs in error :*

I. The jury were misled in view of the evidence in this case—

*First.* By the distinction made by the court between the *motive* or *inducement* for giving the note, and the *consideration* of the note; and,

*Secondly.* (If the distinction were a sound one) in applying it to the contingency of a present existing debt from Philpot and Picket *or* Philpot, Sherman & Co., whereas it should have been confined to a present existing indebtedness from Philpot, Sherman & Co.

As to the latter proposition—

Assuming that the jury might have fairly found that there was a debt of $3500 from Philpot and Picket only for the well purchased on the 19th of October, 1864, yet, as to Sherman, who did not owe the debt, what possible *motive* could he have for becoming liable to Gruninger for this debt? "The execution of this agreement by Gruninger," says the court. Then, if without that agreement *he* would not have been induced to put the debt in that shape, it follows that such agreement was, *as to him*, the consideration of the note.

As to Sherman, therefore, especially, this distinction between the motive or inducement and the consideration, if well founded in any case, was inapplicable to the facts in evidence, and was, therefore, well calculated to, and in fact did, mislead the jury.

Then, as to our first proposition, that the distinction made by the court, in view of the evidence in this case, between the *consideration* of the note and the *motive* or *inducement* operating to cause defendants to give it, misled the jury.

There was obviously controversy between Gruninger and defendants just previous to and at the time this note was given, as to the sale of the well on the Blood Farm. Concede that the evidence is insufficient to show that it was worthless, and that on the whole the defendants were lawfully indebted to Gruninger $3500 for it, but in good faith thought otherwise and refused payment or would only consent to pay or execute the note in question, provided Gruninger would agree to go into and put his property into the proposed new company.

Now, says the court to the jury:

"It may well happen that A. may owe a valid debt to B., and B. may say to A., 'If you will put the debt in the shape of a note I will do some act for you;' and then, when it is so done, the promise to put the debt *in that shape* is not the consideration of that note, but the debt which is due from one to the other."

This was put by way of illustration, to show the distinc-

tion between the consideration and the motive or induce-
ment. If this distinction is known to the books, it can only
apply to such a case as this put by the court, where A. owes
a *valid* debt to B. and does not dispute it, but it could never
apply to a case where, although A. owed a valid debt to B.,
he believed otherwise and denied it, and B. in order to in-
duce A. to give him an acknowledgment of it in the shape
of a promissory note, promises on his part to do some other
thing. In such case, while the valid debt may be in part
the consideration of the note, it is not the whole considera-
tion, and to allow B. to repudiate his promise and sue and
recover *on that note* would be to encourage fraud.

II. We submit also that the court erred in excluding from
the consideration of the jury the articles of copartnership
between Philpot, Sherman, and Picket.

*Mr. O. K. Hutchings, contra.*

Mr. Justice STRONG delivered the opinion of the court.

That a part of the consideration of the note was the debt
due for the oil well which Gruninger had sold six months
before to Philpot and Picket; or that the note was intended
as an adjustment of that debt, is but faintly denied; but the
plaintiffs in error insist that a part at least of the considera-
tion was the agreement of the promisee to contribute to the
formation of the proposed company, an agreement which
they allege he has failed to perform; and they complain that
the jury were misled by an instruction that they might con-
sider whether the signing of the agreement, or the under-
taking of Gruninger to put into the company the interests
mentioned, was anything more than an inducement to the
making of the note by the defendants, furnishing a motive
for giving it, but constituting no part of the consideration.

It is, however, not easy to see how the jury could have
been misled, to the injury of the plaintiffs in error, by call-
ing attention to a possible distinction between the motive
which may have induced giving the note and its considera-
tion, even if no such distinction can be made. For if it be

assumed, as was claimed, that the promisee's undertaking to unite in the formation of a joint stock company was a part of the consideration, it could not aid the promisors. It would not be a step toward showing that the consideration had failed. Gruninger's neglect or refusal to perform his agreement is not to be confounded with the agreement itself. The latter was the consideration, not its performance. He might be answerable in damages for non-performance, but his undertaking to perform would have been the price of the defendants' promise. That undertaking they still have, and with it the full consideration. Nothing is more common than a promise in consideration of a promise, and the defendants' pleas in this case aver that Gruninger's undertaking was the price of their stipulation. Were it then conceded, as the defendants claimed, the jury would not have been warranted in finding that the consideration of the note had failed.

It is, however, not to be doubted that there is a clear distinction sometimes between the motive that may induce to entering into a contract and the consideration of the contract. Nothing is consideration that is not regarded as such by both parties. It is the price voluntarily paid for a promisor's undertaking. An expectation of results often leads to the formation of a contract, but neither the expectation nor the result is "the cause or meritorious occasion requiring a mutual recompense in fact or in law."* Surely a creditor may do a favor to his debtor, or may enter into a new and independent contract with him, induced by which the debtor may assent to giving a note for the previously-existing indebtedness. Without the favor or the new contract there is in such a case a full consideration for the note, and the parties may not have contemplated that the favor or the new contract was to be paid for. To regard them as entering into the consideration of the note would be to make a contract for the parties to which their minds never assented.

It is argued that if Sherman did not owe the debt due

---

* Dyer, 306 b.

from Philpot and Picket to Gruninger (as the jury might have found), there was no motive or inducement, much less even consideration, for his becoming a joint promisor in the note, unless it was Gruninger's agreement, and hence it is inferred that the jury were misled in being allowed to consider that agreement as merely a motive or inducement to his assumption. But he was then a partner of Philpot and Picket, and a joint owner with them of the property for which the debt had been contracted. A consideration moving to his copromisors was enough to support his promise. The note was given for a smaller sum than the price for which the property had been sold to them. It was accepted as a settlement of the promisee's claim, and a conveyance of the property was made to all the defendants, including Sherman. There was, then, adequate consideration for his promise apart from Gruninger's agreement to put other property into the proposed company. For these reasons, we think, there was no error in the instructions given by the court to the jury.

The second assignment is that the court erred in excluding articles of copartnership between the defendants, dated November 8th, 1864. They were offered to show that the partnership did not commence until after the sale of the oil well was made to Philpot and Picket, which was on the 19th of October, 1864, and therefore that Sherman was not a debtor to Gruninger at that time or when the note was afterwards given. The proposed evidence seems to have been intended to show that the debt due for the well was not the consideration of Sherman's promise, and to raise the inference that Gruninger's agreement to join in forming the stock company was. We have already considered that, and from what we have said it appears that the rejection of the evidence did not injure the defendants. That there was error in the rejection has not been seriously contended.

JUDGMENT IS AFFIRMED.